Gary D. BEER, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 01A02–0707–CR–569.

Court of Appeals of Indiana.

April 29, 2008.

Michelle F. Kraus, Fort Wayne, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Justin F. Roebel, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

SHARPNACK, Judge.

Gary Beer appeals his convictions and sentence for three counts of dealing in cocaine as class A felonies,[1] unlawful pos-

---

1. Ind.Code § 35–48–4–1 (2004) (subsequently amended by Pub.L. No. 151–2006, § 22 (eff. July 1, 2006)).

session of a firearm by a serious violent offender,[2] possession of cocaine with the intent to deliver,[3] and maintaining a common nuisance as a class D felony.[4] Beer raises three issues, which we revise and restate as:

I. Whether the trial court abused its discretion by admitting the evidence obtained during the search;

II. Whether the trial court abused its discretion by denying Beer's motion for mistrial; and

III. Whether the trial court erred by imposing consecutive sentences.

We affirm.

The relevant facts follow. On March 29, April 1, and April 13, 2005, officers in the Drug Task Force in Adams County, with assistance from the Indiana State Police, performed three controlled buys of cocaine from Beers by using two confidential informants, "C.I. 1020" and "C.I. 1021." Transcript at 489. C.I. 1020 and C.I. 1021 were engaged to be married and agreed to act as confidential informants in hopes for leniency on a charge pending against C.I. 1021.

During each of the controlled buys, C.I. 1020 and C.I. 1021 met "Allen," who lived on Beer's porch and let them into Beer's house. *Id.* at 621. Each time, C.I. 1020 and C.I. 1021 went to Beer's bedroom, where Beer gave C.I. 1020 cocaine in exchange for money.

On April 14, 2005, the State charged Beer with three counts of dealing in cocaine as class A felonies. That same day, Indiana State Police Detective Daniel Mawhorr applied for a "no knock" search warrant by submitting the following affidavit:

I, Daniel Mawhorr, swear (or affirm, as the case may be) that I believe and have good cause to believe that controlled substances, specifically cocaine, ledgers, U.S. currency (money), packaging materials, controlled substances paraphernalia, ammunition and/or any firearms may be found in a two story tan farmhouse located on the north side of County Road 300 South west of County Road 600 west with an address of 6373 West 300 South—1 in Bluffton, in Adams County, Indiana.... In support of this, I represent that the following is true:

1. CI 1021 stated to this officer that this CI has previously obtained cocaine from a Gary Beer at 6373 West 300 South—1 in Bluffton, in Adams County, Indiana. CI 1020 stated that this CI has obtained cocaine on a regular basis from Gary Beer for the past 2 years.

2. CI 1020 stated to this officer that this CI has previously obtained cocaine from Gary Beer at 6373 West 300 South—1 in Bluffton, in Adams County, Indiana. CI 1020 stated that this CI has obtained cocaine on a regular basis from Gary Beer for the past 2 years.

3. CI 504 provided Detective Kyle Randall, Bluffton Police Department with information regarding other individuals who were dealing controlled substances and burglaries in the area and I was able to confirm that information through Detective Kyle Randall. (see attached exhibit 1)

4. CI 504 stated to Detective Kyle Randall that Gary Beer has stated

---

2. Ind.Code § 35–47–4–5 (2004) (subsequently amended by Pub.L. No. 151–2006, § 21 (eff. July 1, 2006)).

3. I.C. § 35–48–4–1.

4. Ind.Code § 35–48–4–13 (2004).

to CI 504 that Gary Beer will not go back to prison and that if he were caught driving he would not stop for the police. Additionally, CI 504 stated that CI 504 had observed cocaine, rifles, hand guns and shotguns in Gary Beer's residence in the past and knows Gary Beer to carry a .22 caliber handgun on his person. The last time that CI 504 observed these items was on April 4, 2005.

5. CI 504 also stated that Gary Beer [sic] residence is equipped with motion sensors that alert those present in the residence when someone approaches the residence.

6. CI 504 also stated that Gary Beer keeps controlled substances in a safe in one of the outbuildings.

7. On April 11, 2005 Kyle Randall met with CI 1014 who had provided information regarding another individual who had been dealing in controlled substances and Detective Randall was able to confirm and corroborate this information.

8. CI 1014 stated that during the fall of 2004 he had been in contact with Gary Beer. Gary Beer is known to him to have numerous weapons and keeps several of those weapons in the upstairs bedroom. CI 1014 described these weapons as assault weapons.

9. CI 1014 stated that Gary Beer told him that if Gary Beer's house were to be raided again by the police he (Gary Beer) would not go back to prison and would not go down alone. Gary Beer stated that he would take out as many cops as he could. (see attached exhibit 2)

10. On March 28, 2005, CI 1020 contacted Detective Mike Mahan and stated that this CI could purchase controlled substances from Gary Beer at his residence located at 6373 West 300 South—1, in Bluffton, Adams County, Indiana.

11. On March 29, 2005, CI 1020 contacted Detective Mike Mahan and confirmed that the time of the purchase would be approximately 7:00 p.m. on the 29th day of March, 2005.

12. At approximately 6:00p.m. CI 1020 and CI 1021 arrived at a predetermined location and they were searched by law enforcement officers as well as their vehicle. No contraband was found on either person or their vehicle.

13. Both CI 1020 and CI 1021 were furnished with a digital recorder.

14. CI 1020 was provided $600.00 in buy money.

15. At approximately 6:30p.m. CI 1020 and CI 1021 were followed to Gary Beer's residence by law enforcement officers and entered the residence.

16. At approximately 6:48p.m. I observed CI 1020 and CI 1021 leave the residence in their vehicle. They were followed back to the predetermined location and searched. The digital recorders were recovered and it was determined that CI 1020's recorder malfunctioned. Also, CI 1020 turned over $80.00 not needed for the drug buy and explained that $220.00 was used to clear up an old debt and $300.00 was used to purchase ¼ ounce of cocaine. A small baggie containing a white powder was recovered from CI 1020. CI 1020 and CI 1021 along with their vehicle were searched by law enforcement officers and no other contra-

band was located on either CI 1020 or CI 1021.

17. The white powder was later field tested and tested positive for cocaine.

18. CI 1020 stated that they knocked on the door to the residence and a male identified as Allen answered the door. Allen stated that Gary was upstairs. CI 1020 went upstairs while CI 1021 went to the bathroom. When CI 1020 got upstairs he saw Gary Beer in a bedroom sitting at a desk. On the desk were cocaine and a .357 handgun. CI 1020 paid Gary Beer for the old debt and Gary Beer provided CI 1020 cocaine in exchange for $300.00. This was confirmed upon listening to the digital recoding [sic] obtained from CI 1021.

19. On Friday, April 1, 2005 Detective Mahan was contacted by CI 1020 who stated that ¼ ounce of cocaine could be purchased from Gary Beer that afternoon at approximately 5:00p.m.

20. At approximately 4:10p.m. CI 1020 and CI 1021 and their vehicle were searched and no contraband was found.

21. At that time CI 1020 was provided with $400.00 to purchase cocaine.

22. CI 1020 was furnished with a digital recorder.

23. At approximately 4:28p.m. CI 1020 and CI 1021 were followed from the predetermined location to Gary Beer's residence by law enforcement officers.

24. CI 1020 and CI 1021 arrived at Gary Beer's residence at approximately 4:33pm. and were observed driving north on the driveway behind the residence.

25. At approximately 4:50p.m. CI 1020 and CI 1021 were observed leaving Gary Beer's residence in their vehicle.

26. At approximately 5:06 p.m. CI 1020 and CI 1021 arrived at a predetermined location. Both CI 1020 and CI 1021 and their vehicle were searched by law enforcement officers. CI 1020 turned over a small plastic bag containing what I believed to be cocaine through my training and experience and $100.00 that was not needed to purchase the cocaine. The digital recorder was retrieved. No other contraband was located on CI 1020, CI 1021 or in their vehicle.

27. CI 1020 stated that he went to the door of Gary Beer's residence and was met by a male identified by Al. He was told that Gary Beer was upstairs. Both CI 1020 and CI 1021 went upstairs where CI 1020 and Gary Beer exchanged $300.00 for ¼ ounce of cocaine. CI 1020 indicated that he observed a .357 handgun and approximately 3 ounces of cocaine on the desk in the room where Gary Beer was located. This information was confirmed by listening to the digital recording retrieved from CI 1020.

28. On April 13, 2005 Detective Mahan was contacted by CI 1020 who stated that a purchase of cocaine from Gary Beer could be arranged for the afternoon of April 13, 2005. At approximately 3:40p.m. CI 1020 confirmed that the "deal" was set up.

29. On April 13, 2005 at approximately 4:40p.m. CI 1020 and CI 1021 arrived at a predetermined location.

30. At approximately 4:45p.m. CI 1020, CI 1021 and their vehicle were

searched by law enforcement with no contraband being located.

31. CI 1020 was provided $300.00 "buy" money and provided a digital recorder which was later determined to have malfunctioned.

32. At approximately 5:00p.m. CI 1020 and CI 1021 left the predetermined location and were followed by law enforcement officer to Gary Beer's residence.

33. At approximately 5:17p.m. CI 1020 and CI 1021 arrived at Gary Beer's residence.

34. At approximately 5:30p.m. CI 1020 and CI 1021 were observed leaving Gary Beer's residence and were followed to a predetermined location.

35. At approximately 5:43p.m. CI 1020 and CI 1021 arrived at the predetermined location and they and their vehicle were searched by law enforcement officers.

36. Recovered from CI 1020 was a small bag of white powder that was believed to be cocaine through my training and experience. Also recovered was the digital recorder. No other controlled substances were located on CI 1020, CI 1021 or their vehicle.

37. CI 1020 stated that when he and CI 1021 arrived at Gary Beer's residence Jerry Siefring met them outside and then Allen let them in the residence. Once inside he and CI 1021 went upstairs and saw Gary Beer in a bedroom.

38. In the bedroom CI 1020 exchanged the $300.00 for ¼ ounce of cocaine with Gary Beer. CI 1020 observed a .22 caliber handgun on the desk in the bedroom. These statements were not able to be confirmed as no recording was made.

39. Based upon the undersigned's training and experience, he has good cause to believe that the prior activities on March 29, 2005, April 1, 2005, and April 13, 2005 represent an ongoing drug trafficking business and that there will be located in the residence of Gary Beer at 6373 West 300 South—1, in Bluffton, Adams County, State of Indiana controlled substances, specifically cocaine, ledgers, U.S. currency (money), packaging materials, controlled substances paraphernalia and any firearms.

40. I also have good cause to believe that based upon the observation of a firearm on March 29, 2005, April 1, 2005 and April 13, 2005 and information gathered from CI 504 and CI 1014 Gary Beer has several firearms and intends to use them if law enforcement attempt to enter his residence.

41. Therefore, I am hereby requesting a no knock search warrant to be served during the night time hours due to the above exigent circumstances of the presence of firearms and threats on the safety of law enforcement officers.

Appellant's Appendix at 133–138. The trial court issued the search warrant.

The Indiana State Police executed the search warrant between 4:00 a.m. and 5:00 a.m. on April 15, 2005. As a result of the search, the police recovered several firearms including shotguns and rifles. The police found a motion detector, an electronic scale, ammunition, a safe, $2,000 in cash, syringes, a night scope, and cocaine. Of the cash found in Beer's residence, eleven of the bills matched the serial numbers of the bills used in the controlled buys.

The State filed an amended information that further charged Beer with: Count IV, unlawful possession of a firearm by a serious violent felon as a class B felony; Count V, possession of cocaine with the intent to deliver as a class A felony; and Count VI, maintaining a common nuisance as a class D felony.[5]

On May 1, 2006, Beer filed a motion to suppress evidence seized in the execution of the search warrant. Beer argued that: the warrant was not supported by probable cause; there is no such thing as a no knock warrant in Indiana; and there was no probable cause to support a no knock warrant. After a hearing, the trial court denied Beer's motion to suppress.

On January 18, 2007, Beer filed a motion in limine asking the trial court to limit the State from "mentioning, referring to, introducing, or alluding to" any prior history of Beer, any statement alleged to have been made by Beer concerning what he would do if the police appeared at his house, and any information from the confidential informants about the number of times they were at Beer's residence for the purpose of getting high or consuming controlled substances. Appellant's Appendix at 166. The State filed a motion in limine requesting, in part, the trial court to order Beer's counsel to refrain from: (1) cross examining or presenting any evidence of prior arrests or convictions of State's witnesses, outside that which is permitted by Ind. Evidence Rule 609; and (2) cross examining or presenting evidence regarding prior bad acts by the State's witnesses in violation of Ind. Evidence Rule 404(b). *Id.* at 171.

The trial court held a hearing on the motions. The trial court granted Beer's motion in limine "except that if [Beer] testifies and in that testimony 'opens the door' as to the items sought foreclosed in [Beer]'s Motion in Limine, the State of Indiana will then be allowed to present evidence in the area thereby opened." *Id.* at 173. The trial court granted the State's motion in limine "except as to charges and/or penalties of any confidential informant ("CI") which the CI avoided by reason of involvement in [Beer]'s charges." *Id.*

During the trial, the following exchange occurred during the direct examination of Decatur City Police Detective Lieutenant Michael Mahan:

Q: Ok. Once [C.I. 1020] was searched what did you do next?

A: Once he was searched I supplied him with, I believe on the first buy he owed $220.00 from a previous buy as old debt quit [sic] a while ago and I told him I'd take care of that old debt, I paid him $220.00 for that debt and $300.00 for, I'm sorry, I didn't do that. Detective Mawhorr supplied him with the money for that buy.

Transcript at 498. Beer did not object to this exchange. Later, the prosecutor asked C.I. 1021 how she injected cocaine, and then asked her how long Beer "had lived at the residence that [she] went to." Transcript at 630. Beer did not object to this exchange. The prosecutor also asked C.I. 1020 why the police gave him money beyond the amount needed to purchase the cocaine, and C.I. 1020 answered, "I owed it to [Beer] for when I purchased some co-

---

5. The State also filed a notice of intent to seek habitual offender status. Ind.Code § 35–50–2–8 (2004) (subsequently amended by Pub.L. No. 71–2005. § 11 (emerg. eff. April 25, 2005)). On appeal, the State recognizes that "[i]t does not appear that the State ever formally filed a habitual substance offender charge and such charge was not pursued at trial." Appellee's Brief at 2 n. 1.

caine out there earlier. About a month or two earlier." *Id.* at 672. Beer's attorney requested a mistrial and argued that the comments from C.I. 1021 and C.I. 1020 violated Beer's motion in limine and violated Ind. Evid. Rule 404(b). The trial court denied Beer's request for a mistrial and admonished the jury.

The jury found Beer guilty as charged. The trial court found Beer's criminal history as an aggravator and found no mitigators. The trial court sentenced Beer to thirty years for Counts I, II, and III of dealing in cocaine as a class A felony, ten years for Count IV, unlawful possession of a firearm by a serious violent felon as a class B felony, thirty years for Count V, possession of cocaine with intent to deliver as a class A felony, and one and a half years for Count VI, maintaining a common nuisance as a class D felony. The trial court ordered that the sentences for Counts I, II, and III be served concurrently with each other but consecutively to Counts IV, V, and VI, which the trial court ordered to be served consecutive to each other. The trial court sentenced Beer to an aggregate sentence of seventy-one and one-half years.

## I.

■ The first issue is whether the trial court abused its discretion by admitting the evidence obtained during the search. We review the trial court's ruling on the admission of evidence for an abuse of discretion. *Noojin v. State,* 730 N.E.2d 672, 676 (Ind.2000). We reverse only where the decision is clearly against the logic and effect of the facts and circumstances. *Joyner v. State,* 678 N.E.2d 386, 390 (Ind.1997), *reh'g denied.* Even if the

trial court's decision was an abuse of discretion, we will not reverse if the admission constituted harmless error. *Fox v. State,* 717 N.E.2d 957, 966 (Ind.Ct.App. 1999), *reh'g denied, trans. denied.* Beer argues that: (A) Indiana law does not recognize no knock search warrants; and (B) alternatively, the affidavits were insufficient to justify the no knock aspect of the search warrant. We will address each argument separately.

### A. *Whether Indiana Recognizes No Knock Warrants*

■ Beer argues that Indiana law does not recognize a no knock search warrant. Specifically, Beer cites Ind.Code § 35–33–5–7(d) (2004), which provides that "[a] law enforcement officer may break open any outer or inner door or window in order to execute a search warrant, if he is not admitted following an announcement of his authority and purpose." Beer argues that "Indiana is unique" because Ind.Code § 35–33–5–7(d) *"requires* the police to knock and announce their presence and authority."[6] Appellant's Brief at 18.

■ Resolution of this issue requires us to interpret Ind.Code § 35–33–5–7. When interpreting a statute, we independently review the statute's meaning and apply it to the facts of the case under review. *State v. Evans,* 810 N.E.2d 335, 337 (Ind.2004) (citing *Bolin v. Wingert,* 764 N.E.2d 201, 204 (Ind.2002)), *reh'g denied.* "If a statute is unambiguous, that is, susceptible to but one meaning, we must give the statute its clear and plain meaning." *Id.* If a statute is susceptible to multiple interpretations, we must try to ascertain the legislature's intent and interpret the statute so as to effectuate that intent. *Id.*

---

6. We note that the United States Supreme Court has held that violation of the knock and announce rule under the Fourth Amendment does not require suppression of evidence found in a search. *Hudson v. Michigan,* 547 U.S. 586, 588–600, 126 S.Ct. 2159, 2162–2168, 165 L.Ed.2d 56 (2006).

We presume the legislature intended logical application of the language used in the statute, so as to avoid unjust or absurd results. *Id.*

Initially, we note that Ind.Code § 35–33–5–7 does not expressly prohibit entry without announcing the law enforcement officer's authority and purpose when there are exigent circumstances or when it would be dangerous to officers or others to make such an announcement. *See U.S. v. Ramirez*, 523 U.S. 65, 72, 118 S.Ct. 992, 997, 140 L.Ed.2d 191 (1998) (interpreting 18 U.S.C. § 3109, which provided: "The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant," and noting that "by its terms § 3109 prohibits nothing"). Accordingly, we conclude that Ind.Code § 35–33–5–7 authorizes forcible entry when entry is not allowed following announcement of the officer's authority and purpose. The alternative to use of force in such a circumstance would be to go away and try later. The legislature has made it clear that execution of a warrant cannot be frustrated by refusal of entry or silence. The statute says nothing to either authorize or prohibit a "no knock" execution of a warrant under appropriate conditions.

This court has previously interpreted a statute similar to Ind.Code § 35–33–5–7. In *Johnson v. State*, 157 Ind.App. 105, 111, 299 N.E.2d 194, 197 (1973), this court interpreted Ind.Code § 35–1–19–6 (1971),[7] which provided: "To make an arrest in criminal actions, the officer may break open any outer or inner door or window of a dwelling house or any other building or inclosure to execute the warrant, if, after notice of his authority and purpose, he be refused admittance." The defendant argued that "the 'notice of purpose' requirement must be met in all instances." 157 Ind.App. at 111, 299 N.E.2d at 197. The court disagreed and relied on *State v. Dusch*, 259 Ind. 507, 512, 289 N.E.2d 515, 517 (1972), which held, in part:

> It seems clear, therefore, that under both the Federal and State Constitutional provisions dealing with searches and seizures there exists a requirement that the police knock and announce their authority before conducting a search of a dwelling. It is equally apparent, however, that this knock and announce requirement is not to be adhered to blindly regardless of the particular circumstances confronting the authorities at the time the search is to be conducted.

*Id.*, 299 N.E.2d at 197–198. The court concluded that the circumstance encountered by the arresting officers constituted exigent circumstances necessary to excuse the requirement of an announcement of purpose. *Id.* at 113, 299 N.E.2d at 199.

■ Since *Johnson*, the Legislature enacted Ind.Code § 35–33–5–7, but the language is substantially similar to the language in the statute interpreted by *Johnson.* Judicial interpretation of a statute, accompanied by substantial legislative inaction for a considerable time, may be understood to signify the Legislature's acquiescence and agreement with the judicial interpretation. *See Fraley v. Minger*, 829 N.E.2d 476, 492 (Ind.2005). It appears that the Legislature is in acquiescence with the *Johnson* interpretation that a notice of purpose requirement need not be met in all circumstances.

---

**7.** Repealed by Pub.L. No. 320–1983 (eff. July 1, 1983).

With this acquiescence in mind, we note that Ind.Code § 35–33–5–7 is not inconsistent with the knock and announce requirements set forth in case law from both the United States Supreme Court and our state courts. Indiana courts have held that it is well settled that the knock and announce requirement under the United States Constitution and the Indiana Constitution need not be adhered to blindly regardless of the particular circumstances confronting the authorities at the time the search is to be conducted. *See Davenport v. State,* 464 N.E.2d 1302, 1305 (Ind.1984) (holding that "[i]t is well settled that Indiana recognizes the 'knock and announce' rule for the execution of arrest and search warrants," and "[i]t is also well settled that this knock and announce requirement is not to be adhered to blindly regardless of the particular circumstances confronting the authorities at the time the search is to be conducted."), *reh'g denied; Dusch,* 259 Ind. at 512, 289 N.E.2d at 517.[8]

In summary, Ind.Code § 35–33–5–7 does not expressly prohibit a no knock warrant. It is well settled in Indiana common law that the knock and announce requirement need not be followed blindly in all circumstances. The Legislature appears to have acquiesced in the interpretation that a notice of purpose requirement need not be met in all circumstances. We conclude that Indiana law supports no

knock warrants under certain circumstances. *See Johnson,* 157 Ind.App. at 113, 299 N.E.2d at 199. This is consistent with holdings from other states. *See People v. Dumas,* 9 Cal.3d 871, 109 Cal.Rptr. 304, 512 P.2d 1208, 1212 (1973) (applying a statute, which provided that "[t]he officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute the warrant, if after notice of his authority and purpose, he is refused admittance," and holding that strict compliance with the demand and notice requirements may be excused if the facts known to the officer were sufficient to support his good faith belief that compliance would increase his peril, frustrate the arrest, or permit the destruction of evidence); *State v. Carson,* 21 Wash.App. 318, 584 P.2d 990, 991 (1978) (holding that compliance with statute, which provided that "[t]o make an arrest ... the officer may break open any outer or inner door ... if, after notice of his office and purpose, he be refused admittance," was excused when exigent and necessitous circumstances exist).

### B. *No Knock Warrant*

■■■■■■ Alternatively, Beer argues that the affidavit in support of the search warrant was insufficient to justify the no knock aspect of the search warrant.[9] *See*

---

**8.** Beer cites *State v. Smith,* 562 N.E.2d 428 (Ind.Ct.App.1990), *reh'g denied.* In *Smith,* another panel of this court addressed the issue of whether the trial court erred by granting the defendants' motion to suppress the evidence from the search of their residence because the copy of the search warrant provided to the defendants during the search was not signed by the issuing judge. 562 N.E.2d at 429. The court held that "failure of the issuing judge to sign the original or a copy of the search warrant does not invalidate a search warrant in Indiana provided the issuing judge or magistrate found probable cause existed and intended to issue the search war-

rant." *Id.* at 430. The court noted that Ind. Code § 35–33–5–7(d) "requires an officer executing a search warrant announce the officer's authority and the purpose of the visit," but "contains no explicit or implicit requirement that service of a copy of the warrant be made upon the person whose residence is to be searched." *Id.* To the extent that *Smith* is in conflict with *Davenport,* we decline to follow *Smith.*

**9.** Beer appears to challenge only the no knock aspect of the search warrant. Beer does not argue that C.I. 1020 and C.I. 1021 were not reliable or that the controlled buys failed to

Appellant's Brief at 11–17. In order to justify a no knock warrant, there must be a reasonable suspicion that knocking and announcing the officers' presence, under the particular circumstances, would be dangerous, futile, or inhibit the effective investigation of the crime.[10] *See Richards v. Wisconsin*, 520 U.S. 385, 394, 117 S.Ct. 1416, 1421, 137 L.Ed.2d 615 (1997) ("In order to justify a 'no-knock' entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence."); *see also Dusch*, 259 Ind. at 513, 289 N.E.2d at 518 (analyzing *Ker v. California*, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963), and holding that under *Ker* "the focus is on the particular situation encountered by the police in a certain case which lead them to reasonably conclude that to announce their authority would be a useless gesture or would result in personal injury"). Reasonable suspicion exists if the facts known to the officer, together with the reasonable inferences arising therefrom, would cause an ordinarily prudent person to believe

that knocking and announcing their presence would be dangerous. *See Mitchell v. State*, 745 N.E.2d 775, 786–787 (Ind.2001) ("Reasonable suspicion exists if the facts known to the officer, together with the reasonable inferences arising therefrom, would cause an ordinarily prudent person to believe that criminal activity has or is about to occur."); *see also Polk v. State*, 739 N.E.2d 666, 668 (Ind.Ct.App.2000) ("Reasonable suspicion exists if there are specific and articulable facts which lead a police officer to believe that criminal activity has occurred or is about to occur."). "This showing is not high, but the police should be required to make it whenever the reasonableness of a no-knock entry is challenged." *Richards*, 520 U.S. at 394–395, 117 S.Ct. at 1422.

Here, Detective Mawhorr's affidavit stated in part:

3. CI 504 provided Detective Kyle Randall, Bluffton Police Department with information regarding other individuals who were dealing controlled substances and burglaries in the area and I was able to confirm that information through Detective Kyle Randall. (see attached exhibit 1) [11]

provide probable cause. To the extent that Beer suggests that the affidavit in support of the search warrant failed to establish probable cause to support the search warrant generally, we disagree. *See Castillo v. State*, 734 N.E.2d 299, 306 (Ind.Ct.App.2000) (holding that the officer's search of informant before and after controlled buys, coupled with monitoring of transactions by wire, was sufficient for officer's testimony to provide probable cause for issuance of search warrant), *reh'g denied, summarily aff'd by*, 741 N.E.2d 1196 (Ind.2001).

10. Beer argues that "[t]he search warrant in this case must fail because the officers failed to establish probable cause on the no-knock entry." Appellant's Brief at 17. To the extent that Beer argues that "probable cause" is the proper standard for analyzing whether a

"no knock" entry is legal, we disagree. Generally, the state and federal constitutions guarantee that a court will not issue a search warrant without probable cause. U.S. CONST. amend IV; IND. CONST. art. 1, § 11. However, reasonable suspicion is required to perform a search by a no knock entry. *See Richards v. Wisconsin*, 520 U.S. 385, 394, 117 S.Ct. 1416, 1421–1422, 137 L.Ed.2d 615 (1997) (holding that the reasonable suspicion standard "as opposed to a probable-cause requirement— strikes the appropriate balance between the legitimate law enforcement concerns at issue in the execution of search warrants and the individual privacy interests affected by no-knock entries").

11. Beer appears to concede that C.I. 504 gave information on a burglary but argues that it was "nothing more than giving a name al-

4. CI 504 stated to Detective Kyle Randall that Gary Beer has stated to CI 504 that Gary Beer will not go back to prison and that if he were caught driving he would not stop for the police. Additionally, CI 504 stated that CI 504 had observed cocaine, rifles, hand guns and shotguns in Gary Beer's residence in the past and knows Gary Beer to carry a .22 caliber handgun on his person. The last time that CI 504 observed these items was on April 4, 2005.[12]

\* \* \* \* \* \*

7. On April 11, 2005 Kyle Randall met with CI 1014 who had provided information regarding another individual who had been dealing in con-

trolled substances and Detective Randall was able to confirm and corroborate this information.

8. CI 1014 stated that during the fall of 2004 he had been in contact with Gary Beer. Gary Beer is known to him to have numerous weapons and keeps several of those weapons in the upstairs bedroom. CI 1014 described these weapons as assault weapons.[13]

9. CI 1014 stated that Gary Beer told him that if Gary Beer's house were to be raided again by the police he (Gary Beer) would not go back to prison and would not go down alone. Gary Beer stated that he would take out as many cops as he could. (see

---

ready suspected by the police." Appellant's Brief at 13. Beer also appears to argue that C.I. 1014 provided information but that information was merely common knowledge to anyone on the street that might be using drugs. Beer does not develop these arguments or cite to authority in support of them and has waived these arguments. *See Davenport v. State*, 734 N.E.2d 622, 623–624 (Ind. Ct.App.2000), *trans. denied.*

Beer also argues that this paragraph is misleading because it "pluralizes 'individuals' and infers that CI [504] provided information on several persons." Appellant's Brief at 13. However, Detective Randall's affidavit stated that C.I. 504 had given him "credible information concerning other drug dealers and burglars." Appellant's Appendix at 141. Thus, we do not find Paragraph 3 misleading.

**12.** Beer argues that this paragraph is misleading because it leaves the impression that the conversations occurred on April 4, 2005, when they occurred three and a half months prior to April 4, 2005. We cannot say that the date at the end of Paragraph 4 leaves the impression that the conversations occurred on April 4, 2005. At the suppression hearing, C.I. 504 testified that the conversations regarding whether Beer would ever go back to prison occurred "a couple of months" before April 4, 2005. Transcript at 124. Beer's attorney brought up C.I. 504's deposition, in

which C.I. 504 had stated that the conversation occurred three and a half months before April 4, 2005. In response, C.I. 504 testified that "it was an on going subject." *Id.* at 125. Further, even if the conversations occurred three and a half months before April 4, 2005, we conclude that the information could be considered to determine whether reasonable suspicion exists. *See Cheever–Ortiz v. State*, 825 N.E.2d 867, 872 (Ind.Ct.App.2005) (holding that the trial court did not err by considering stale information as part of the totality of the circumstances creating probable cause).

**13.** Beer argues that this paragraph is misleading. Specifically, Beer points to C.I. 1014's testimony at the suppression hearing that he had told Detective Randall that he had never been in the bedroom. At the suppression hearing, C.I. 1014 confirmed that he had told Detective Randall that he had seen weapons, which he described as a "fucking arsenal," in Beer's barn, and that he had not been inside Beer's house in eleven years. Transcript at 165. C.I. 1014 also testified that he had seen several clips of ammunition "just inside the house from the back porch area" in 2005. *Id.* at 166–167. We cannot say that the fact that C.I. 1014 had seen the weapons in the barn and not in Beer's house or that he had not seen the weapons in eleven years alters the finding of reasonable suspicion in light of the remaining portions of the affidavits.

attached exhibit 2) [14]

\*　　\*　　\*　　\*　　\*　　\*

Appellant's Appendix at 133–134. Detective Mawhorr's affidavit also indicated that C.I. 1020 observed a .357 handgun and a .22 caliber handgun on the desk in Beer's bedroom during the controlled buys. *Id.* at 135–137. Detective Mawhorr's affidavit concluded as follows:

40. I also have good cause to believe that based upon the observation of a firearm on March 29, 2005, April 1, 2005 and April 13, 2005 and information gathered from CI 504 and CI 1014 Gary Beer has several firearms and intends to use them if law enforcement attempt to enter his residence.

41. Therefore, I am hereby requesting a no knock search warrant to be served during the night time hours due to the above exigent circumstances of the presence of firearms and threats on the safety of law enforcement officers.

*Id.* at 137–138. Affidavits of Bluffton Police Detective Kyle Randall were attached to Detective Mawhorr's affidavit and stated:

CI 504 originally agreed to purchase cocaine from Gary Beer for the DE-TECT Drug Task Force. CI 504 did not complete this task in fear of retaliation from Gary Beer or his associates. Instead of buying cocaine off of Gary [B]eer, CI 504 had given me credible information concerning other drug dealers and burglars. CI 504 gave me a correct and current address of a suspected drug dealer in Wells County, IN, who had active warrants. A Wells County Sheriff Deputy attempted to serve these warrants. Nobody would answer the door at that residence. Approximately one week later, I learned from the drug dealer's mother-in-law that this drug dealer was hiding in the house when the deputy was there. The drug dealer, knowing the police knew where he lived, moved to Adams County, IN, a short time later. CI 504 has also provided me information concerning a business burglary in Wells County. I had come up with one suspect on this case, but I did not have the evidence to prove a case. I had not shared any information on this case with CI 504. CI 504 notified me that he had seen the safe that was taken in this burglary. CI 504 gave me the same suspect name that I had come up with and the suspect's accomplice. Neither the suspect nor the accomplice will speak with me reference [sic] the case, and the case remains open. Nevertheless, CI 504 provided me credible information concerning this case. CI 504 continued to provide information about certain drug dealers in Wells County, IN. This information was information that I had already learned or that I could corroborate.

\*　　\*　　\*　　\*　　\*　　\*

CI 1014 then turned his attention to another drug dealing suspect. CI 1014 told me the method of operation for this particular drug dealing suspect, what drug the suspect was dealing and how the best way would be for law enforcement to build a case against this suspect. Since learning of the information provid-

---

**14.** Beer appears to argue that this paragraph is misleading. Beer argues that "CI 1014 testified that he told the detective that in fact these statements were not made to him but were made by Beer at a bar with a room full of people and that he only overheard them." Appellant's Brief at 15. Beer does not develop this argument, and we cannot say that whether Beer told C.I. 1014 or a room full of people including C.I. 1014 affects the determination of whether reasonable suspicion exists.

ed to me by CI 1014, I have built a drug dealing criminal case against this suspect utilizing a different CI to conduct the undercover purchase of cocaine. An arrest in this case is pending.

*Id.* at 141–143.

Based on the affidavits, we conclude that C.I. 504 and C.I. 1014 were credible because they had provided correct information in the past.[15] The information provided by C.I. 504, C.I. 1014, and C.I. 1020 establishes a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous to the officers. *See, e.g., U.S. v. Ramirez*, 523 U.S. 65, 71, 118 S.Ct. 992, 997, 140 L.Ed.2d 191 (1998) (holding that police had a reasonable suspicion that knocking and announcing their presence might be dangerous to themselves or to others when a subject of search warrant was a prison escapee with a violent past who reportedly had access to a large supply of weapons and had vowed that he would "not do federal time"); *Dumas*, 109 Cal.Rptr. 304, 512 P.2d at 1214 (holding that police need not comply with knock and announce rule when police had reliable information that defendant possessed weapons and habitually answered the door with a firearm).

In summary, Ind.Code § 35–33–5–7 does not prohibit no knock warrants under all circumstances, and the State had reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous. Accordingly, we conclude that the trial court did not abuse its discretion by admitting the evidence obtained during the search.

## II.

 The next issue is whether the trial court abused its discretion by denying Beer's motion for mistrial. The decision to grant or deny a motion for mistrial lies within the discretion of the trial court. *Francis v. State*, 758 N.E.2d 528, 532 (Ind. 2001). "The grant of a motion for mistrial is an extreme remedy that is warranted only when less severe remedies will not satisfactorily correct the error." *Id.* To prevail, the defendant "must show that he was placed in a position of grave peril to which he should not have been subjected." *Id.* The gravity of the peril is determined by the probable persuasive effect on the jury's decision. *James v. State*, 613 N.E.2d 15, 22 (Ind.1993).

 Beer argues that the motion in limine was violated when C.I. 1020 mentioned that he had purchased cocaine from Beer earlier.[16] Beer points to the following exchange that occurred during the direct examination of C.I. 1020:

15. Beer also argues that Detective Randall's report did not contain information about the criminal histories of CI 504 and 1014 or the benefits they received. Beer also argues that "[t]here was no independent police investigation to corroborate the statements made by the informants that Beer would go down fighting." Appellant's Brief at 16. Beer's arguments do not affect our conclusion that C.I. 504 and C.I. 1014 gave correct information in the past.

16. Beer points to Detective Lieutenant Mahan's testimony that C.I. 1020 "owed $220.00 from a previous buy as old debt." Transcript at 498. Beer also points to the prosecutor's question to C.I. 1021 of how she injected cocaine, and then asked her how long Beer "had lived at the residence that [she] went to." Transcript at 630. Beer did not object to either of these exchanges. A failure to object at trial results in waiver of the issue on appeal. *Mitchell v. State*, 726 N.E.2d 1228, 1235 (Ind.2000), *reh'g denied*. Although fundamental error is an exception to waiver, Beer does not argue that fundamental error occurred.

Q: ... How much buy money did the police give to you?

A: They gave me $300.00 plus the 210 that I owed [Beer]. They gave me $510.00 altogether. That's on the first buy.

Q: Ok. How much was the cocaine to be purchased for?

A: $300.00.

Q: $300.00. So what was the extra money for?

A: I owed it to [Beer] for when I purchased some cocaine out there earlier. About a month or two earlier.

Transcript at 671–672. Beer's attorney then requested a mistrial and argued that the comments violated Beer's motion in limine and Ind. Evid. Rule 404(b).

We note that after the motion for mistrial, the trial court admonished the jury as follows:

> Ladies and Gentlemen of the jury, there are rules of evidence, one of those rules discusses testimony or statements of prior bad acts that are not in front of you, that are not part of what is charged raises prejudice that is unfair to the defendant because the defendant is not aware that it has to be defended. It was not prepared to be presented. It's not relevant to this case in particular and there are a number of other reasons. For that reason, I am informing you that the last portion of [C.I. 1020]'s answer was an improper response to the question initially asked by the State. I am instructing you absolutely to disregard from any consideration the last portion of this witnesses [sic] answer when he was just most recently here on the witness stand.

Transcript at 692.

▇▇▇▇ "The presence of jury admonitions may be considered in determining whether an error is harmless." *Bonner v.* *State,* 650 N.E.2d 1139, 1142 (Ind.1995). "A timely and accurate admonition is presumed to cure any error in the admission of evidence." *James v. State,* 613 N.E.2d 15, 22 (Ind.1993). "However, the simple fact that an admonition is given does not necessarily mean that particularly prejudicial, erroneously admitted evidence will be erased from the minds of reasonable jurors or omitted from their deliberations." *Bonner,* 650 N.E.2d at 1142.

In *White v. State,* 257 Ind. 64, 69, 272 N.E.2d 312, 314–315 (1971), the Indiana Supreme Court acknowledged a number of factors to examine when considering the adequacy of striking improper testimony and admonishing the jury. Specifically, the court acknowledged the following factors: (1) the effect of constitutional provisions, statutes or rules relating to harmless error; (2) the degree of materiality of the testimony; (3) other evidence of guilt; (4) other evidence tending to prove the same fact; (5) other evidence that may cure the improper testimony; (6) possible waiver by the injured party; (7) whether the statement was volunteered by the witness and whether there had been deliberate action on the part of the prosecution to present the matter to the jury; (8) the penalty assessed; (9) whether or not the testimony, although volunteered by the witness, was in part brought out by action of the defendant or his counsel; (10) the existence of other errors; (11) whether the question of guilt is close or clear and compelling; (12) the standing and experience of the person giving the objectionable testimony; and (13) whether or not the objectionable testimony or misconduct was repeated. *White,* 257 Ind. at 69, 272 N.E.2d at 314–315.

We will examine a number of the factors acknowledged in *White.* The statements

that C.I. 1020 had previously purchased drugs from Beer were material to the issue to be decided by the jury. The testimony was not brought out by the action of Beer's counsel; however, we cannot say that the prosecutor took deliberate action on the part of the prosecution to present the matter to the jury.[17] Over the course of a three day trial, only two specific references to Beer's prior drug dealing were made. Based on the evidence of the three controlled buys, the question of guilt is clear and compelling. We cannot say that Beer was placed in a position of grave peril. We conclude that the trial court did not abuse its discretion by denying Beer's motion for a mistrial.[18] See, e.g., James v. State, 613 N.E.2d 15, 22–23 (Ind.1993) (holding that the overwhelming evidence of guilt and the trial court's prompt admonishment were sufficient to cure any prejudice resulting from evidence of criminal history).

17. During the discussion of the motion for mistrial, Beer's counsel admitted:

It is not my, the prosecutor has not intentionally elicited this information. I don't believe the case law requires there to be an inadvertent statement can be the cause for a mistrial, there's no question about that. So I'm not, you know, disparaging or accusing [the prosecutor] of trying to sabotage this . . .

Transcript at 677.

18. Beer relies on Garcia v. State, 509 N.E.2d 888, 890 (Ind.Ct.App.1987), in which this court held that the defendant was placed in a position of grave peril to which he should not have been subjected. We find Garcia distinguishable. In Garcia, the court held that it was "indisputable that the prosecution deliberately sought to present the prejudicial information to the jury." 509 N.E.2d at 890. The trial court held that the prosecution repeated the accusation of a prior felony conviction against Garcia. Id. The court also noted that there was a substantial credibility issue because Garcia, his wife, and his neighbor told a different story from that told by a police

## III.

■ The next issue is whether the trial court erred by imposing consecutive sentences. Beer argues that: (A) the trial court's sentencing statement does not sufficiently support a finding of consecutive sentences; (B) his sentence violates Ind. Code § 35–50–1–2(c); and (C) his sentence is improper under Beno v. State, 581 N.E.2d 922 (Ind.1991), and Gregory v. State, 644 N.E.2d 543 (Ind.1994), reh'g denied. We will address each argument separately.[19]

### A. Sentencing Statement

■ Beer argues that the "trial court's sentencing statement does not sufficiently support a finding of consecutive sentences." Appellant's Brief at 28. "In order to impose consecutive sentences, a trial court must find at least one aggravating circumstance." Ortiz v. State, 766 N.E.2d 370, 377 (Ind.2002); see Ind.Code § 35–50–

officer. Id. Here, the prosecutor did not take deliberate action to present the matter to the jury, Beer only cites to two specific references, and there is clear and compelling evidence of Beer's guilt.

19. Indiana's sentencing scheme was amended effective April 25, 2005, to incorporate advisory sentences rather than presumptive sentences. See Ind.Code §§ 35–38–1–7.1, 35–50–2–1.3. Beer committed his offenses prior to the effective date and was sentenced after April 25, 2005. We apply the version of the sentencing statutes in effect at the time Beer committed his offenses. See Gutermuth v. State, 868 N.E.2d 427, 431 n. 4 (Ind.2007) (noting that "[h]ad the new [sentencing] statute become effective between the date of [a defendant]'s crime and his sentencing, the version of the statute in effect at the time of [a defendant]'s crime would have applied"); see also Padgett v. State, 875 N.E.2d 310, 316 (Ind.Ct.App.2007) (reviewing the defendant's sentencing under the presumptive sentencing scheme when defendant committed his crime before the effective date of the new sentencing scheme, but was sentenced after this date) trans. denied.

1–2(c) (2004).[20] At the sentencing hearing, the trial court stated, "the reason for the consecutive, I think I'm obligated to give some sort of a discussion on how I look at this," and then found Beer's criminal history as an aggravator.[21] Transcript at 837. Based on the trial court's finding of an aggravator, we conclude that the trial court's sentencing statement was sufficient. *See, e.g., Newman v. State,* 690 N.E.2d 735, 738 (Ind.Ct.App.1998) (holding that the trial court's sentencing statement was sufficient to support the imposition of consecutive sentences).

### B. *Ind.Code § 35–50–1–2(c)*

■■■ Beer appears to argue that his sentence violates Ind.Code § 35–50–1–2(c), which provides, in pertinent part:

[E]xcept for crimes of violence, the total of the consecutive terms of imprisonment, exclusive of terms of imprisonment under IC 35–50–2–8 and IC 35–50–2–10, to which the defendant is sentenced for felony convictions arising out of an episode of criminal conduct shall not exceed the presumptive sentence for a felony which is one (1) class of felony higher than the most serious of the felonies for which the person has been convicted.

**20.** Subsequently amended by Pub.L. No. 71–2005, § 4 (emerg. eff. April 25, 2005), Pub.L. No. 213–2005 (emerg. eff. May 11, 2005), Pub.L. No. 1–2006, § 549 (emerg. eff. March 24, 2006).

**21.** Beer does not challenge this aggravator.

**22.** We note that the trial court ordered that the sentences for Counts I, II, and III be served concurrently with each other.

**23.** Specifically, Count IV alleged that "on or about April 15, 2005 … Beer … having previously been convicted of a serious violent felony … did own or possess a firearm, to-wit: various firearms including, but not limited to: a 12 gauge shotgun; a 20 gauge shot-

Beer argues that "[t]he three buys (Count 1–3) are a single episode of criminal conduct as defined by statute."[22] Appellant's Brief at 27. Beer also argues that "because those three buys are used to establish probable cause for the search warrant, the state is continuing its sting operation when it obtains and executes the warrant," and the remaining counts are "all within the same criminal episode as the three buys." *Id.*

We first examine whether Counts I, II, and III are within the same episode of criminal conduct as Counts IV, V, and VI. Ind.Code § 35–50–1–2(b) provides that an "episode of criminal conduct" means "offenses or a connected series of offenses that are closely related in time, place, and circumstance."

Counts I, II, and III charged Beer with dealing in cocaine as class A felonies and relate to the controlled buys that occurred on March 29, April 1, and April 13, 2005. As a result of the search on April 15, 2005, the State charged Beer with: Count IV, unlawful possession of a firearm by a serious violent felon as a class B felony;[23] Count V, dealing in a narcotic drug with intent to deliver as a class A felony;[24] Count VI, maintaining a common nuisance as a class D felony.[25] Because the controlled buys resulting in Counts I, II, and

gun, a 9mm handgun, and a 22 caliber revolver…." Appellant's Appendix at 26.

**24.** Count V alleged that "on or about April 15, 2005 … Beer did knowingly or intentionally possess cocaine with the intent to deliver, said cocaine having a weight of three (3) grams or more…." *Id.*

**25.** Count VI alleged that "on or about April 15, 2005 … "did knowingly maintain a building, structure, vehicle or place, residence; that was used one (1) or more times for keeping, offering for sale, selling, delivering, and/or financing the delivery of controlled substances and/or items of drug paraphernalia, to-wit: cocaine and paraphernalia…." *Id.* at 27.

III occurred days before the search and involved different circumstances, we conclude that Counts I, II, and III are not within the same criminal episode as Counts IV, V, and VI.

To the extent that Beer argues that his sentence for Counts IV, V, and VI violated Ind.Code § 35–50–1–2, we will address Beer's argument. Even assuming, without deciding, that Counts IV, V, and VI, were within the same criminal episode, we cannot say that Beer's sentence violated Ind. Code § 35–50–1–2. Count V was a class A felony. The next more serious class of felony is murder, for which the presumptive sentence is fifty-five years. *See* Ind. Code § 35–50–2–3 (2004).[26] Accordingly, under Ind.Code § 35–50–1–2(c), Beer's sentence for Counts IV, V, and VI could not exceed fifty-five years. The trial court sentenced Beer to ten years for Count IV, thirty years for Count V, and one and a half years for Count VI. The trial court ordered that the sentences for Counts IV, V, and VI, run consecutively to each other. Thus, the trial court sentenced Beer to a total sentence of forty-one and a half years for Counts IV, V, and VI. The trial court's sentence does not exceed the statutory limit of Ind.Code § 35–50–1–2(c). *See Hardister v. State,* 849 N.E.2d 563, 577–578 (Ind.2006) (holding that the defendant's revised sentence did not exceed the sentence permitted by Ind.Code § 35–50–1–2).

## C. *Beno and Gregory*

Lastly, Beer cites *Beno v. State,* 581 N.E.2d 922 (Ind.1991), and *Gregory v.* *State,* 644 N.E.2d 543 (Ind.1994), *reh'g denied,* in support of his argument that consecutive sentences were improper.[27] We find both of those cases distinguishable.

In *Beno,* after two controlled drug purchases, the defendant was convicted of two counts of dealing in cocaine and one count of maintaining a common nuisance. 581 N.E.2d at 923. The trial court sentenced the defendant to the maximum sentence for each offense and ordered that the sentences to be served consecutively. *Id.* On appeal, the defendant argued that his sentence was manifestly unreasonable. *Id.* at 923. The Indiana Supreme Court noted that the crimes were committed as a result of a police sting operation and did not consider it "appropriate to then impose maximum and consecutive sentences for each additional violation." *Id.* at 924.

In *Gregory,* as the result of a government sting operation, the defendant was convicted of four counts of selling cocaine to the same police informant. 644 N.E.2d at 544. The trial court sentenced the defendant to the presumptive term of thirty years on each count and ordered each count to be served consecutively. *Id.* The Indiana Supreme Court addressed whether the consecutive sentences were manifestly unreasonable and held that "[c]onsecutive sentences are not appropriate when the State sponsors a series of virtually identical offenses." *Id.* The Indiana Supreme Court reduced the sentence to a total of fifty years. *Id.* at 546.

---

26. Subsequently amended by Pub.L. No. 71–2005, § 6 (emerg. eff. April 25, 2005), Pub.L. No. 99–2007, § 212 (emerg. eff. May 2, 2007).

27. *Beno* and *Gregory* addressed the defendants' sentences within the context of the defendants' claims that their sentences were manifestly unreasonable. The Indiana Supreme Court amended Ind. Appellate Rule

7(B), effective January 1, 2003. Under the amended rule, in considering whether to revise a sentence, we must determine if the sentence is "inappropriate" rather than whether the sentence is "manifestly unreasonable." Beer does not argue that his sentence is inappropriate in light of the nature of the offense or the character of the offender.

Here, unlike in *Beno* and *Gregory,* the trial court did not impose the maximum possible sentences for Count I, II, or III or order that these sentences be served consecutively to each other. Rather, the trial court imposed the advisory sentence for the three convictions of dealing in cocaine as class A felonies and ordered that the sentences be served concurrently. Thus, Beer's reliance on *Beno* and *Gregory* is misplaced.

For the foregoing reasons, we affirm Beer's convictions and sentence for three counts of dealing in cocaine as class A felonies, unlawful possession of a firearm by a serious violent offender, dealing in a narcotic drug with intent to deliver, and maintaining a common nuisance as a class D felony.

Affirmed.

BARNES, J. and VAIDIK, J. concur.