**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**KIMBERLY A. JACKSON**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**KARL M. SCHARNBERG**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| MATTHEW BRYANT, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 03A01-1110-CR-496 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE BARTHOLOMEW SUPERIOR COURT
The Honorable Chris D. Monroe, Judge
Cause No. 03D01-1012-FA-1625

**October 11, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BROWN, Judge**

Matthew Bryant appeals his convictions and sentences for burglary as a class A felony, two counts of criminal confinement as class B felonies, two counts of intimidation as class C felonies, and battery resulting in serious bodily injury as a class C felony.  Bryant raises five issues which we revise and restate as:

I.      Whether the trial court abused its discretion by admitting certain evidence;

II.     Whether the evidence is sufficient to sustain Bryant's conviction for burglary as a class A felony;

III.    Whether Bryant's convictions for burglary as a class A felony and battery as a class C felony violate double jeopardy;

IV.     Whether the prosecutor committed prosecutorial misconduct that resulted in fundamental error;

V.      Whether the court abused its discretion in sentencing Bryant; and

VI.     Whether Bryant's sentence is inappropriate in light of the nature of the offenses and the character of the offender.

We affirm in part and remand.

The relevant facts follow.  In May 2010, E.B. began a relationship with Bryant. By September 2010, they were arguing a lot.  During the two weeks prior to December 4, 2010, Bryant and E.B. were "arguing all of the time," and Bryant was "very possessive and controlling."  Transcript at 286.  On December 1, 2010, Bryant had a spare key to E.B.'s apartment.

On December 3, 2010, E.B. worked, and Bryant spent the night with her.  The next morning, E.B. went to work and had to work later than her regular shift.  Bryant sent E.B. text messages throughout the day because he was angry that E.B. was working late

2

and accused her of being somewhere other than work. Bryant told E.B. that he was leaving and would not be at her apartment when she arrived home.

Around 7:00 p.m., E.B. returned home and thought that Bryant was gone as all of the lights were off in the apartment. E.B. went upstairs to change her clothes and then saw a flashlight on her and felt Bryant grab her. Bryant threw E.B. into the bedroom, threw her on the floor, held her down, attempted to remove her phone from her possession, and yelled at her. E.B. attempted to escape, but Bryant was straddled over her. E.B. "ended up off . . . the floor" and attempted to run for the stairs to run downstairs, but Bryant grabbed her, picked her up, and took her down the hallway to her bedroom. Id. at 290. E.B. flailed, kicked, and tried to "squirm away." Id. at 291.

E.B. "ended up like flying backwards and slammed the back of [her] head against the wall and it knocked [her] down." Id. Bryant picked her up and yelled: "[L]ook what [you're] doing to [yourself] and look what [you] made happen." Id. Bryant picked up E.B., put her on her bed, straddled her again, pulled out a knife, and flipped open the blade. Bryant then called Billy Boker and told him that E.B. was "freaking out and going crazy," that he did not know what was wrong with E.B., that he was going to "put a stop to it," and that he needed two "guys to come down and be the clean-up crew." Id. at 292. E.B. thought that Bryant was going to kill her. Bryant told E.B. to talk to Boker, and E.B. told Boker to tell Bryant to stop.

At some point, Bryant and E.B. ended up downstairs, E.B. attempted to run out the front door, but Bryant grabbed her from behind and hit her with his arm around her throat. Bryant then dragged E.B. into the living room and struck her in the jaw which

3

hurt "really bad" and knocked one of her teeth loose. Id. at 294. E.B. then sat down on the floor, became overwhelmingly fatigued, curled up with her knees pulled to her chest, and fell asleep.

On the morning of December 5, 2010, E.B. woke up in bed next to Bryant. At some point that day, E.B. took the spare key back from Bryant. E.B. went to work and did not call the police because she was afraid of the consequences and that Bryant would physically harm her if he discovered that she had called the police. That day, Bryant sent E.B. text messages and "[i]t was like nothing ever happened." Id. at 298. Bryant told E.B. that he loved her and that he was going to cook her dinner that night.

On the morning of December 6, 2010, E.B. drove Bryant to his friend's house. E.B. drove into the driveway of the friend's house, and Bryant exited the car and said, "I love you, I'll see you later." Id. at 299. Before driving away, E.B. said, "I'm not doing this anymore and I [don't] want to be with [you]." Id. As soon as E.B. drove away, Bryant called her, and E.B. did not answer. Bryant called again, and they had a short conversation while E.B. drove to work in which E.B. told Bryant that she did not want to be with him anymore. After work, E.B. went to her apartment to grab some clothes and spent the night at her coworker's house. Bryant called E.B.'s phone "non-stop," and E.B. could not "really use [her] phone because it was just call after call after call and [Bryant] would text." Id. at 302. Bryant told E.B. that life without him was going to be torture. Bryant left a voicemail message for E.B. in which he stated that he was at her apartment and that the doors were weak and that he would make the cops shoot him.

4

That same day, Bryant sent E.B. multiple text messages. Specifically, Bryant sent E.B. a text message that read:

> Maybe we can pass love letters thru the doors to each other when were in there together. Oh my bad you will be by yourself with a case & ill be dead cuz [I] made them shoot me. Hope you like ten to twenty babe.

State's Exhibit 24. E.B. thought that Bryant was threatening to "get her in trouble" and that she would go to jail. Transcript at 306. Bryant sent E.B. a text message that stated: "Very strong odor coming from ur place," and "There sayn something bout a meth lab at your place babe. What the f---?" State's Exhibits 20, 49. Bryant sent E.B. a text message that read: "Call my bluff then is what you do babe." State's Exhibit 21. E.B. took this message to mean that if she did not talk to him that he was going to set her up and that she was going to be in trouble. Bryant also sent E.B. a text message that read:

> [E.B.] if your gonna keep doin this shit then dont trip when [I] hook you up with something special. Yea im tired of all this bullshit so since you want to play your games then ill play mine & you will lose. Absolutely lose everything. I mean everything too [E.B.]. Call me or answer your phone when [I] call or be ready for whatever.

State's Exhibits 22, 23.

On December 7, 2010, the calls and texts from Bryant to E.B. "wouldn't stop." Transcript at 308. E.B. worked that day and then went home to obtain clean clothes for the next day. While E.B. was talking on the phone to her sister, she saw a bag on her patio. E.B. nudged the bag with her toe and two glass jars full of liquid fell over. E.B. told her sister that it looked like a meth lab and told her sister to call the police because she was not going to touch the bag. After seeing the bag, Bryant's text messages made

5

more sense to E.B. Specifically, E.B. thought that the text from Bryant that mentioned a foul odor referred to the smell of anhydrous ammonia.

E.B. waited at her apartment until police arrived, told the police what Bryant had done that day, showed the police the text messages from the prior night, and told the police what had occurred on December 4th. Columbus Police Detective Tom Foust gave E.B. his cell phone number and told her to contact him immediately if she knew Bryant's location and to call 911 in the event of an emergency. The police escorted E.B. to her workplace, and a police detective escorted E.B. to her friend's house after E.B. finished her shift. On December 8, 2010, E.B.'s friend drove her to work, and Bryant never stopped calling E.B. E.B. again stayed at her friend's house that night.

On December 9, 2010, E.B. worked until 4:30 p.m. and then went to her house. Bryant knocked on E.B.'s door, and E.B. sent Detective Foust a text message indicating that Bryant was at her residence. Detective Foust called E.B. and heard a female and male screaming. Based upon the tone of the voices, Detective Foust asked for all available units to respond in emergency mode to E.B.'s residence because he believed that Bryant was harming E.B.

E.B. called 911 and while she was talking to the 911 operator, Bryant kicked in her patio door. E.B. locked herself in an upstairs bathroom, but Bryant kicked in the bathroom door. Bryant then closed the bathroom door behind him, grabbed E.B., and struck her. E.B. told Bryant that she had called 911 and that he should leave, but Bryant kept hitting E.B.'s face with a closed fist and yelling at her. Bryant said: "Why are you making me do this? You're making me do this to you. I don't understand why you're

doing this." Id. at 326. Bryant then paused for a moment, pulled a knife out of his pocket, looked at E.B. "like [she] was really, really pathetic," put the knife back in his pocket, and started hitting E.B. again. Id. at 327.

Columbus Police Sergeant Jennifer VanVactor was the first officer on the scene and observed that the patio door had been kicked in and there was debris from the doorway on the ground. Other officers arrived and entered E.B.'s residence. Bryant stated that E.B. was going to "get what [she] want[ed] because [he was] going to make them shoot [him] in front of" her. Id. at 328. Bryant sat on the toilet and put his feet on the door, and E.B. crawled across the floor and curled up under the sink. The police ordered Bryant to open the door, and Bryant yelled that they would have to shoot him through the door. Bryant then retrieved his phone and said that he was going to call his mother before the police killed him. The police started kicking the bathroom door in, and at some point the toilet shattered out from under Bryant. The door would open a little, but then close because Bryant had his feet on the door. After seven or eight kicks, the police opened the door.

The police escorted E.B. out of the bathroom and then turned their attention to Bryant who was still sitting on the toilet. Columbus Police Officer James Quesenbery could not see Bryant's right hand, and he and Sergeant Ziegler ordered Bryant to show them his hands. Bryant showed the officers his left hand but would not show his right hand. Sergeant Ziegler then used his taser on Bryant. Bryant fell off the toilet and landed on the bathroom floor and still refused to show his right hand. Sergeant Ziegler

7

used his taser again, and Bryant brought forth his right hand and was handcuffed and removed from the bathroom.

E.B. suffered swollen and cut lips, deep tissue damage in her jaw, and bruises down the center of her back, the side of her jaw, her leg, and above her left eye. E.B. and Bryant were treated in the same emergency room.

On December 15, 2010, the State charged Bryant with Count I, burglary as a class A felony; Count II, criminal confinement as a class B felony; Count III, criminal confinement as a class B felony; Count IV, intimidation as a class C felony; Count V, battery as a class C felony; Count VI, intimidation as a class C felony; and Count VII, strangulation as a class D felony.[1]

E.B. changed her phone number and stayed with her sister for a month. Bryant sent E.B. multiple letters from jail. One of the letters stated: "I'm not expecting you to be with me but, babe, I still need you to prove my innocence in some matters." Id. at 353. At some point, E.B. resumed talking to Bryant and talked to him several times a day. Bryant sent E.B. a letter indicating that he had made a draft of a letter for E.B. to copy in her own handwriting and Bryant told E.B. "what to say to lie to get him out of his charges." Id. at 358. E.B. wrote a letter to Bryant's attorney that stated that she had never had a physical fight with Bryant on December 4, 2010, that she could have left, and that she was not in fear of Bryant. E.B.'s letter also stated that she had had a couple of drinks on December 9, 2010, allowed Bryant to enter her apartment, became enraged and upset, and decided to call 911 to have the police arrest Bryant.

---

[1] Counts I, II, IV, V related to the events of December 9, 2010, and Counts III, VI, and VII, related to the events of December 4, 2010.

8

At some point, Bryant sent E.B. a letter which stated in part:

> 911 call?  Reason for?  Call lasted exactly 4 min. 58 secs.  Was mad at me could be the reason for 911 call.  You called but thought you hung up & could of put phone in pocket while still on or accidently hit "talk" button when phone was in your pocket??
>
> I told them that when I was going to leave apartment you was upset & mad so you slammed patio door & while doing so it hit my shoulder and then you opened it cause you knew it made contact with me & felt bad & I came back into apartment & you slammed/closed door shut but dead-bolt hit door-frame & broke??  No forced entry by me but when I first got there we did hug & kiss and then the arguing started.
>
> We both ended up in the bathroom because we were both afraid of what was gonna happen to me seeing as how the police said I was "armed & dangerous" & you knew better than that.  Let it be known that I moved you from out in front of the bathroom door right before they kicked it in & when the police kicked it in the door hit me & closed shut again so they did it again & it hit me a second time & made me fall against the toilet so hard that I shattered the toilet with my back.
>
> Baby these are some of the major points of the matter that we need to focus on.  You did good with the wording in your letter.

State's Exhibit 39.

For several months, E.B. intended to "tell lies" to help Bryant avoid the consequences of the charges.  Transcript at 395.  As more time went by, E.B. and Bryant began arguing, and E.B.'s perception of the situation changed.  In a letter dated June 12, 2011, Bryant wrote the following to E.B.:

> Babe we got a very important matter coming up on Friday and yeah I'll admit that I'm a lil nervous cause whatever is said then can either make me or break me but I've got trust & faith in good ol' Baby Booski and you'll stay loyal to me and baby.  I'm gonna ask if we can give each other a hug & kiss and that way it pretty much seals that up that still in good standings with one another plus I just wanna touch you and feel your soft sexy lips against mine.  Ya dig what I'm sayin babe?

* * * * *
9

> Please be at my visit Tuesday at 6:30p & stop being scared cause it's a lil to late for all that now so stand by me and let's ride or die (LOL) to the end TOGETHER, FOREVER!!

State's Exhibit 50. In a letter dated June 14, 2011, Bryant wrote E.B.: "Trust me love I'm no dummy when it comes to the law so take my word that I'll be out this year so keep those legs crossed & my p---y warm cause Matty is coming home to his baby . . . ." State's Exhibit at 51.

On June 17, 2011, E.B. attended a deposition and by that time had decided that she was not going to lie for Bryant. In July 2011, Bryant sent E.B. a letter that stated: "Whenever your [sic] done being shady & disloyal then you know where to find me until then (if EVER) be safe & know I miss you & love you." State's Exhibit 53. At some point after the deposition, E.B. received visits from someone that she knew to belong to the Aryan Brotherhood.

On September 12, 2011, Bryant filed a motion in limine with respect to an alleged shooting charged in cause number 03D01-1011-FC-1486 and an alleged battery charged in cause number 03D01-1108-FB-4453. On September 20, 2011, the court held a suppression hearing but did not appear to rule specifically on Bryant's motion in limine. On September 26, 2011, the State filed a motion to dismiss Count VII, strangulation as a class D felony, which the court granted.

At the four-day jury trial, the State presented evidence, including E.B.'s testimony, consistent with the foregoing facts. When the prosecutor introduced the medical record for E.B.'s emergency room visit, Bryant's counsel objected on hearsay

10

grounds to the portion of the record indicating that E.B. was assaulted.[2] The prosecutor argued that the report was admissible under Ind. Evidence Rule 803, and the court overruled Bryant's objection and admitted the medical records as State's Exhibit 55.[3] Dr. Jason Dugger, the emergency room physician, testified, without objection, that according to the medical report, E.B. stated that she was pushed and trapped in a bathroom, punched several times in the head, face, and jaw, and hit in the back by the bathroom door. Michelle Cline, the nurse that treated E.B., testified, without objection, that E.B.'s chief complaint was that "she was assaulted by her boyfriend, ex-boyfriend." Transcript at 496. On redirect, Cline testified that E.B. told her that she had been beaten up by her ex-boyfriend and that E.B. did not want Cline to document that statement because "she was assaulted by her boyfriend because she was afraid of him." Id. at 500. When the prosecutor asked Cline whether E.B. told her why she was afraid of him, Bryant's counsel objected on hearsay grounds. After further questioning by the prosecutor, Cline indicated that it was important for her to know if there were any safety concerns of the

---

[2] The following exchange occurred:

[Defense Counsel]: Objection to the, objection to the portions where it says (inaudible) and . . .

THE COURT: (Inaudible).

[Defense Counsel]: And assaulted by, the names are scratched out. I object to that because this is a, this is a report (inaudible) it's a hearsay statement (inaudible) conclusion as to an ultimate fact.

Transcript at 477-478.

[3] The medical record included a form titled "Emergency Physician Record Alleged Assault," and under "context" the following words were circled: "fists," "pushed/thrown," "pushed/thrown against wall," "reported spousal abuse." State's Exhibit 55. A handwritten notation states: "Pushed/trapped in bathroom punched several times in head, face, and jaw. Hit back on BR door." Id.

11

patient and it was important to know why E.B. was scared to make an effort to address those concerns before E.B. was released. The court overruled Bryant's objection, and Cline testified that E.B. said she was afraid for herself and her children and that her boyfriend was a part of the Aryan Brotherhood and that "if he did not hurt her, he would send people to hurt her and her children." Id. at 501-502.

At one point, Detective Foust testified that he investigated a person who went to E.B.'s residence on July 18, 2011. Detective Foust testified that he spoke to Chucky Hardman, a member of the Aryan Brotherhood, during the course of his investigation and that as a result of his investigation he called for an extra patrol and asked all officers to give heavy attention to E.B.'s residence.

E.B. described an interaction following her son's birthday party that occurred in September 2010 in which she told Bryant that she did not want to be with him anymore and that she did not love him. When asked what happened next, Bryant's counsel objected upon Evidence Rule 404, and the court overruled the objection. E.B. then testified that Bryant pulled a gun on her and said that if she was going to leave him, then he was going to shoot her in the middle of the street. E.B. told Bryant "never mind," that she just wanted to have some time, and that she would call him later. Id. at 280.

During E.B.'s direct examination, E.B. testified that she had concerns regarding retaliation from Bryant's friends, and when asked what relationship Bryant had with his friends, Bryant's counsel objected.[4] The court overruled the objection, and E.B. testified that Bryant was a vice president in the Aryan Brotherhood and that she was scared that if

---

[4] Specifically, Bryant's counsel stated: "Objection. Improper (inaudible) for evidence." Transcript at 285.

12

Bryant "got mad that they, you know, that if he told them to do something, they would do it." Id. at 285.

Later during the direct examination of E.B., she testified that she received text messages from Bryant, that she saved some of the text messages, and that State's Exhibits 20, 21, 22, 23, 24, and 25, which were photographs of the text messages, accurately showed the content of the text messages. When the prosecutor moved to admit photographs of these text messages, Bryant's counsel objected on the basis of authentification. The court overruled the objection and admitted the exhibits. The court then held a sidebar conference in which the court stated that Bryant's counsel was "sort of kind of right" and that the court was "kind of letting it slide because I know it's going to happen anyway, but you didn't authenticate it." Id. at 304. The court also told the prosecutor: "I'm telling you the next time you're going to have to do that question before or the objection's going to be sustained." Id. E.B. then testified that she knew that Bryant was the sender of the text message in State's Exhibit 24 because the phone number was the number that he was using and described the messages.

Bryant testified he went to E.B.'s apartment and that E.B. opened the door for him and eventually started yelling. According to Bryant's testimony, he told E.B. that her walls were too thin and that he did not want her neighbors to call the police and that he was going to leave and that she should call him when she calmed down. Bryant walked toward the patio door, and E.B. slammed the door which bounced back and hit E.B.'s eye. Bryant then kissed E.B. on her forehead, nose, and lips. E.B. became angry and told Bryant that she had already called the police. Bryant also testified that he went upstairs

13

to the bathroom, at some point E.B. hit herself in the face three or four times, the police never screamed at him to open the bathroom door, and he did not refuse to show the police his hands.

During cross-examination of Bryant, the prosecutor replayed voicemails left by Bryant on E.B.'s phone on December 6 and 7, 2010. The prosecutor asked Bryant why he thought the cops were going to shoot him down because he was outside E.B.'s door, and Bryant stated: "Well, what was going on with my life, it's hard telling." Id. at 673. Bryant's counsel asked to approach and stated: "I believe the State's getting ready to introduce that incidental shooting and I would object to that based on relevancy and on other, other grounds as well." Id. The prosecutor stated that she was going to ask a question regarding the existence of an arrest warrant but make no reference to the shooting or the facts. The court stated: "Well, I think [Bryant] kind of opened the door by saying stuff going on in his life, so. I mean, you know, State's choice, push it too far, we'll have to do the whole thing over," and overruled the objection. Id. at 674. Bryant then testified that he had a warrant and knew that the police were looking for him. The court asked Bryant one of the juror's questions which was whether he was on home detention on December 4 or 9, 2010, and Bryant stated that he left home detention.

The jury found Bryant guilty as charged. The court sentenced Bryant to forty-five years for Count I, eighteen years for Count II, eighteen years for Count III, six years for Count IV, six years for Count V, and six years for Count VI. The court ordered that Counts I and V be served concurrent with each other and that all other sentences be

14

served consecutive to each other for an aggregate sentence of ninety-three years. Additional facts will be provided as necessary.

I.

The first issue is whether the trial court abused its discretion by admitting certain evidence. Specifically, Bryant challenges the admission of E.B.'s statements made at the hospital, Bryant's prior misconduct, and text messages. Generally, we review the trial court's ruling on the admission of evidence for an abuse of discretion. Noojin v. State, 730 N.E.2d 672, 676 (Ind. 2000). We reverse only where the decision is clearly against the logic and effect of the facts and circumstances. Joyner v. State, 678 N.E.2d 386, 390 (Ind. 1997), reh'g denied. Even if the trial court's decision was an abuse of discretion, we will not reverse if the admission constituted harmless error. Fox v. State, 717 N.E.2d 957, 966 (Ind. Ct. App. 1999), reh'g denied, trans. denied.

A.    E.B.'s Statements

Bryant argues that the trial court abused its discretion when it admitted evidence of E.B.'s statements at the hospital via E.B.'s medical records and the testimony of Dr. Dugger and Nurse Cline. Initially, we observe that Bryant concedes that he objected to Cline's testimony regarding the basis for E.B.'s fears of her ex-boyfriend but otherwise did not object to the challenged testimony from Dr. Dugger or Cline. Thus, at least a portion of Bryant's argument is waived. See Johnson v. State, 734 N.E.2d 530, 532 (Ind. 2000) (holding that the failure to object at trial waives any claim of error and allows otherwise inadmissible hearsay evidence to be considered for substantive purposes and to establish a material fact at issue). Moreover, errors in the admission of evidence are to be

15

disregarded as harmless error unless they affect the substantial rights of a party. McClain v. State, 675 N.E.2d 329, 331 (Ind. 1996); Ind. Trial Rule 61. In determining whether error in the introduction of evidence affected the defendant's substantial rights, this court must assess the probable impact of the evidence upon the jury. McClain, 675 N.E.2d at 331. Here, the testimony of the treating physician and nurse and the medical records are merely cumulative of E.B.'s testimony. Admission of hearsay evidence is not grounds for reversal where it is merely cumulative of other evidence admitted. Id. at 331-332. As a result, any error in the admission of E.B.'s statements via the medical records and relevant testimony was harmless and reversal is not required. See id. (holding that any error in the admission of the therapist's testimony was harmless and reversal was not required where hearsay evidence was merely cumulative of other evidence admitted).

B.     Bryant's Prior Misconduct

Bryant points to the admission of E.B.'s testimony that Bryant drew a gun and threatened to kill her in September 2010 when she indicated that she wanted to end their relationship, evidence of Bryant's membership and office in the Aryan Brotherhood, evidence of Bryant's convictions for burglary in 1999, criminal recklessness in 2007, and invasion of privacy in 2009, and evidence indicating that Bryant escaped from home detention and had an outstanding warrant at the time of the December incidents. Bryant argues that this evidence should have been excluded under Ind. Evidence Rules 404(b) and 403.

The standard for assessing the admissibility of Rule 404(b) evidence is: (1) the court must determine that the evidence of other crimes, wrongs, or acts is relevant to a

16

matter at issue other than the defendant's propensity to commit the charged act; and (2) the court must balance the probative value of the evidence against its prejudicial effect pursuant to Rule 403. Boone v. State, 728 N.E.2d 135, 137-138 (Ind. 2000), reh'g denied; Hicks v. State, 690 N.E.2d 215, 221 (Ind. 1997). The evidence is inadmissible when the State offers it only to produce the "forbidden inference" that the defendant has engaged in other, uncharged misconduct and the charged conduct was in conformity with the uncharged misconduct. Crain v. State, 736 N.E.2d 1223, 1235 (Ind. 2000). The trial court has wide latitude, however, in weighing the probative value of the evidence against the possible prejudice of its admission. Id. If evidence has some purpose besides behavior in conformity with a character trait and the balancing test is favorable, the trial court can elect to admit the evidence. Boone, 728 N.E.2d at 138. For instance, evidence which is necessary for the jury to understand the relationships between the victim, various witnesses, and the defendant may be admissible. See Wilson v. State, 765 N.E.2d 1265, 1270-1271 (Ind. 2002).

With respect to E.B.'s testimony that Bryant pulled a gun on her and that Bryant was a member of the Aryan Brotherhood, this evidence showed the nature of the relationship between Bryant and E.B., explained her actions and fear of Bryant, and also partially showed the motive behind Bryant's actions. Similarly, we cannot say that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. See, e.g., id. (evidence of defendant's drug dealing and prostitution-related activities was admissible in murder prosecution and did not violate Rule 404(b) or Rule 403 where the evidence was "necessary for the jury to understand the relationships

17

between the victim, various witnesses, and the defendant"); Ross v. State, 676 N.E.2d 339, 346 (Ind. 1996) (prior misconduct was "admissible because it demonstrated the defendant's motive and intent to commit the murder and illuminated the relationship between the defendant and victim"); Iqbal v. State, 805 N.E.2d 401, 408-409 (Ind. Ct. App. 2004) (holding that the evidence relating to a prior incident in which the defendant put a gun to the victim's head and threatened to kill her was indicative of the defendant's relationship with the victim and highly relevant for his motive to shoot victim and that the trial court did not abuse its discretion by admitting the defendant's bad acts under Rule 404(b)).

To the extent that Bryant challenges the admission of evidence of his convictions, we observe that Bryant cites to a portion of the transcript which occurred after the State rested and does not point to the record to support the idea that the prosecutor introduced evidence of Bryant's criminal history prior to resting initially. Further, prior to Bryant's testimony his counsel asked Bryant outside the presence of the jury whether he understood that some or all of his criminal history could come in if he testified, and Bryant indicated that he understood. During direct examination, Bryant testified that he had a criminal history, was convicted of burglary, spent time in prison, became associated with the Aryan Brotherhood while in prison, and became a vice president in the Aryan Brotherhood. We cannot say that the admission of Bryant's criminal history and participation in the Aryan Brotherhood requires reversal.

To the extent that Bryant challenges evidence that he escaped from home detention and had an outstanding warrant at the time of the December incidents, we

18

observe that Bryant objected to evidence of the shooting and did not specifically object to evidence of a warrant or object to the court's asking a juror's question regarding home detention. Again, we cannot say that this evidence requires reversal.

C.  Text Messages

When the substance of a text message is offered for an evidentiary purpose, the text message must be separately authenticated pursuant to Ind. Evidence Rule 901(a). Hape v. State, 903 N.E.2d 977, 990 (Ind. Ct. App. 2009), trans. denied. Rule 901 provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Absolute proof of authenticity is not required. Fry v. State, 885 N.E.2d 742, 748 (Ind. Ct. App. 2008), trans. denied. When evidence establishes a reasonable probability that an item is what it is claimed to be, the item is admissible. Thomas v. State, 734 N.E.2d 572, 573 (Ind. 2000). When a trial court has made a ruling concerning the sufficiency of the foundation laid to justify the admission of evidence, we review that decision for an abuse of discretion. Id. (citing State v. Walton, 715 N.E.2d 824, 828 (Ind. 1999)). Ind. Evidence Rule 901(b) provides "[b]y way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule" and includes:

> Telephone conversations. Telephone conversations, by evidence that a call was made to the number assigned at the time by the telephone company to a particular person or business, if (i) in the case of a person, circumstances, including self-identification, show the person answering to be the one called, or (ii) in the case of a business, the call was made to a place of

business and the conversation related to business reasonably transacted over the telephone.

Ind. Evidence Rule 901(b)(6).

The text messages here indicated that they were from phone number 317-447-5310, and E.B. testified that Bryant used this number. E.B. also testified that she received text messages from Bryant, that she saved some of the text messages, and that State's Exhibits 20, 21, 22, 23, 24, and 25, which were photographs of the text messages, accurately showed the content of the text messages that Bryant sent her. Based upon the record, we conclude that the State established a foundation for admission of the text messages pursuant to Ind. Evidence Rule 901, and the court did not abuse its discretion in admitting the text messages.

Bryant also argues that to the extent his objections were insufficient to preserve the error in the admission of all of the evidence of E.B.'s statements at the hospital, his uncharged misconduct, and the text messages, fundamental error applies and requires reversal. To rise to the level of fundamental error, an error "must constitute a blatant violation of basic principles, the harm or potential for harm must be substantial, and the resulting error must deny the defendant fundamental due process." Maul v. State, 731 N.E.2d 438, 440 (Ind. 2000). "The standard for fundamental error is whether the error was so prejudicial to the rights of the defendant that a fair trial was impossible." Boatright v. State, 759 N.E.2d 1038, 1042 (Ind. 2001). In light of the foregoing discussion, we cannot say that the admission of the evidence constituted fundamental error.

II.

The next issue is whether the evidence is sufficient to sustain Bryant's conviction for burglary as a class A felony. When reviewing claims of insufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses. Jordan v. State, 656 N.E.2d 816, 817 (Ind. 1995), reh'g denied. Rather, we look to the evidence and the reasonable inferences therefrom that support the verdict. Id. We will affirm the conviction if there exists evidence of probative value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. Id. The uncorroborated testimony of one witness, even if it is the victim, is sufficient to sustain a conviction. Ferrell v. State, 565 N.E.2d 1070, 1072-1073 (Ind. 1991).

The offense of burglary as a class A felony is governed by Ind. Code § 35-43-2-1, which provides that "[a] person who breaks and enters the building or structure of another person, with intent to commit a felony in it, commits burglary, a Class C felony. However, the offense is . . . a Class A felony if it results in: (A) bodily injury; or (B) serious bodily injury; to any person other than a defendant." Thus, to convict Bryant of burglary as a class A felony, the State needed to prove that Bryant broke and entered E.B.'s building or structure with the intent to commit a felony in it and that E.B suffered bodily or serious bodily injury.

Bryant argues that the State failed to prove his unauthorized entry into the apartment on December 9, 2010. Bryant argues that the record established that he either possessed a key or did not know he lacked a key to the apartment until his arrest and that the record does not reveal any statement by E.B. to Bryant after he was given the key that he was no longer allowed in the apartment. The State argues that an authorized entrant

21

does not have to kick down a patio door to gain entry when the other person is home. The State also argues that "it is a fair inference that no person would authorize another to kick down their door and pursue them to the bathroom where they could be confined and beaten." Appellee's Brief at 24.

Bryant's argument is essentially a request that we reweigh the evidence or judge the credibility of witnesses, which we cannot do. Jordan, 656 N.E.2d at 817. Based upon the record, including the testimony regarding the kicked in door and E.B.'s testimony that she had taken back her spare key from Bryant and had told him that she did not want to be with him, we conclude that the State presented evidence of a probative nature from which a reasonable trier of fact could have found that Bryant's entry of E.B.'s apartment was unauthorized and that he was guilty of burglary as a class A felony.

### III.

The next issue is whether Bryant's convictions for burglary as a class A felony and battery as a class C felony violate double jeopardy. The Indiana Constitution provides that "[n]o person shall be put in jeopardy twice for the same offense." IND. CONST. art. 1, § 14. The Indiana Supreme Court has held that "two or more offenses are the 'same offense' in violation of Article I, Section 14 of the Indiana Constitution, if, with respect to either the statutory elements of the challenged crimes or the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense." Richardson v. State, 717 N.E.2d 32, 49 (Ind. 1999).

22

Under the actual evidence test, the evidence presented at trial is examined to determine whether each challenged offense was established by separate and distinct facts. Lee v. State, 892 N.E.2d 1231, 1234 (Ind. 2008). To show that two challenged offenses constitute the "same offense" in a claim of double jeopardy, a defendant must demonstrate a reasonable possibility that the evidentiary facts used by the fact-finder to establish the essential elements of one offense may also have been used to establish the essential elements of a second challenged offense. Id. The Indiana Supreme Court has determined the possibility to be remote and speculative and therefore not reasonable when finding no sufficiently substantial likelihood that the jury used the same evidentiary facts to establish the essential elements of two offenses. Hopkins v. State, 759 N.E.2d 633, 640 (Ind. 2001) (citing Long v. State, 743 N.E.2d 253, 261 (Ind. 2001), reh'g denied; Redman v. State, 743 N.E.2d 263, 268 (Ind. 2001)); see also Griffin v. State, 717 N.E.2d 73, 89 (Ind. 1999), cert. denied, 530 U.S. 1247, 120 S. Ct. 2697 (2000).

Bryant argues that both counts were enhanced to a higher level felony based on the same evidence of serious bodily injury to E.B. and requests that this court reverse his conviction for burglary as a class A felony and reduce it to a class B felony. The State points out that the charging information and final instructions do not specify particular injuries for particular counts and that it never differentiated one injury from another in either the evidence or its closing arguments in assigning injuries to the counts. The State concedes that "[i]n light of the fact that there is no way to determine that any particular injury went with any particular count, the State agrees that it would be impossible to determine that the jury relied upon different injuries for the burglary and battery counts."

23

Appellee's Brief at 26. The State submits that this court reduce Bryant's battery conviction to a class B misdemeanor.

Based upon the State's concession and our review of the record, we conclude that there was a reasonable possibility that the jury relied upon the same evidence of bodily injury when it found Bryant guilty of enhanced versions of burglary and battery. "When two convictions are found to contravene double jeopardy principles, a reviewing court may remedy the violation by reducing either conviction to a less serious form of the same offense if doing so will eliminate the violation." Richardson, 717 N.E.2d at 54. Accordingly, we reduce Bryant's conviction for battery from a class C felony to a class B misdemeanor. See, e.g., Smith v. State, 872 N.E.2d 169, 177 (Ind. Ct. App. 2007) (holding that although "sufficient evidence might exist to support a finding that [the defendant] caused two separate bodily injuries, we conclude that [the defendant] has demonstrated a reasonable possibility that the same bodily injury was used to enhance both his burglary and robbery convictions"), trans. denied.

IV.

The next issue is whether the prosecutor committed prosecutorial misconduct that resulted in fundamental error. In reviewing a properly preserved claim of prosecutorial misconduct, we determine: (1) whether the prosecutor engaged in misconduct, and if so, (2) whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she should not have been subjected. Cooper v. State, 854 N.E.2d 831, 835 (Ind. 2006). Whether a prosecutor's argument constitutes misconduct is measured by reference to case law and the Rules of Professional Conduct.

24

Id. The gravity of peril is measured by the probable persuasive effect of the misconduct on the jury's decision rather than the degree of impropriety of the conduct. Id.

When an improper argument is alleged to have been made, the correct procedure is to request the trial court to admonish the jury. Id. If the party is not satisfied with the admonishment, then he or she should move for mistrial. Id. Failure to request an admonishment or to move for mistrial results in waiver. Id. Bryant concedes that while he objected to part of the conduct of the prosecutor, he failed to seek an admonishment or mistrial.

Where, as here, a claim of prosecutorial misconduct has not been properly preserved, our standard for review is different from that of a properly preserved claim. Id. More specifically, the defendant must establish not only the grounds for the misconduct but also the additional grounds for fundamental error. Id. Fundamental error is an extremely narrow exception that allows a defendant to avoid waiver of an issue. Id. It is error that makes "a fair trial impossible or constitute[s] clearly blatant violations of basic and elementary principles of due process . . . present[ing] an undeniable and substantial potential for harm." Id.

A.    Evidentiary Harpoon

Bryant argues that the prosecutor launched an evidentiary harpoon when the prosecutor attempted to establish that Bryant sent Chucky Hardman to E.B.'s home to threaten or kill her. "An evidentiary harpoon involves the deliberate use of improper evidence to prejudice the defendant in the eyes of the jury." Williams v. State, 512 N.E.2d 1087, 1090 (Ind. 1987). "To prevail on such a claim, the defendant must show

25

that (1) the prosecution acted deliberately to prejudice the jury, and (2) the evidence was inadmissible." Alvies v. State, 795 N.E.2d 493, 504 (Ind. Ct. App. 2003) (citing Evans v. State, 643 N.E.2d 877, 879 (Ind. 1994), reh'g denied), trans. denied.

The following exchange occurred during the direct examination of Detective Foust:

Q                  Based on your information and investigation, did you identify the person who came to [E.B.'s] home?

[Defense Counsel]: Objection. No, there's no personal knowledge of that.

THE COURT:      Approach, please.

**SIDEBAR:**

THE COURT:      Okay. It sounds like the question calls for hearsay when you say based on your investigation, did you obtain information.

[Prosecutor]:      Uh-huh.

THE COURT:      So, that's not precise enough or even proper to advise defense counsel how to make a proper objection. It could be hearsay, it may not be. I mean, you could have a photograph (inaudible) so it's too vague. So, the objection's going to be sustained to that question. But where are you going to go next? Is it going to be somebody else told him so?

[Prosecutor]:      Yes, but . . .

THE COURT:      Who?

[Prosecutor]:      Detective Ward, I believe. A police officer said . . .

THE COURT:      (Inaudible).

[Prosecutor]:      I don't know. I'll have to . . .

THE COURT:      Okay, well, okay. Well, objection's sustained then.

26

**SIDEBAR ENDS**

THE COURT:    Objection's sustained.

Q    In the course of your investigation, did you have reason to go speak with a person by the name of Chucky Hardman?

A    Yes.

Q    And is a Chucky Hardman a member of the Aryan Brotherhood?

A    Yes.

Q    What, if anything, did you tell Chucky Hardman?

A    I told Mr. Hardman that I was investigating a complaint by [E.B.] and her roommate about someone showing up at her home.

Q    And as a result of your investigation, did you send out any communications to the other persons, well, law enforcement officers at the Columbus Police Department?

A    Yes. I issued what we call an extra patrol and asked all officers to give heavy attention to the residence of [E.B.] because of Mr. Hardman's actions and fearing that her life may be in danger.

Transcript at 542-544.

During the direct examination of Bryant, he testified that he never had anyone from the Aryan Brotherhood go to E.B.'s house or new apartment. During rebuttal, the following exchange occurred during the direct examination of Detective Foust:

Q    And Detective Foust, in the course of your investigation, did you cause have cause to go speak with Chuck Hardman?

A    Yes.

Q    And for what purpose did you go speak with Chuck Hardman?

A    To inquire about his activities while he was on work release.

27

Q          Okay.  And what specific activities were those?

A          That he had gone to [E.B.'s] home.

Q          Did Chuck Hardman identify to you the person that sent him to [E.B.'s] home?

[Defense Counsel]:  Objection.  It's calling for hearsay.

THE COURT:          Sustained.

Q          Did Chuck Hardman identify the person who sent him to [E.B.'s] home?

[Defense Counsel]:  Same objection.

THE COURT:          Sustained.  Approach.

**SIDEBAR:**

[Prosecutor]:          Eight oh one D.

THE COURT:          State never (inaudible) a witness.  Mr. Hardman has never testified.  [E.B.] did.  Mr. Hardman has not been a witness and therefore doesn't fall under this rule.

[Prosecutor]:          Okay.

**SIDEBAR ENDS**

[Prosecutor]:          No further questions.

Id. at 759-760.

Bryant argues that the prosecutor's "clear intent was to establish Bryant sent Hardman to E.B.'s home to threaten or kill her."  Appellant's Brief at 37.  Bryant also argues that the "evidence regarding Hardman's alleged visit to E.B.'s home was hearsay, as the trial court repeatedly found, because Hardman did not testify and no one who allegedly saw Hardman at E.B.'s home testified."  Id. at 37-38.  The State argues that it

28

was unsuccessful in placing the fact that Bryant sent Hardman to E.B.'s house before the jury because it called the wrong witness to sponsor such a statement. The State also argues: "In order for an evidentiary harpoon to constitute error, the harpoon must hit the whale. The State, in this instance, fired the harpoon straight into the gunwale and thus the harpoon never left the boat." Appellee's Brief at 29. Under the circumstances, we cannot say that Bryant has demonstrated fundamental error.

B.    Bryant's Criminal History & Membership in the Aryan Brotherhood

Bryant points to the admission of his criminal history and gang activities as evidence of prosecutorial misconduct. Due to our resolution of Issue I regarding the admission of Bryant's criminal history and membership in the Aryan Brotherhood, we cannot say that the prosecutor committed misconduct or that Bryant has demonstrated fundamental error.

C.    Closing Argument

Bryant points to the prosecutor's comments during closing argument and argues that the prosecutor improperly referred to evidence outside the record including the nature of domestic violence relationships. During closing argument, the prosecutor stated: "Through the testimony that you've received, you now understand that the relationship between [E.B.] and [Bryant] is a typical picture of a domestic violence relationship. Domestic violence relationships are about power and control, not love." Transcript at 776. The State argues that the court system depends on jurors applying their own common sense and life experiences. The State argues that "[m]any people have encountered domestic violence and for the State to ask jurors to examine whether the

relationship portrayed in the evidence comports with their understanding of violent relationships, the State is merely requesting the jury to use the tools at its disposal in arriving at a just verdict." Appellee's Brief at 30. We cannot say that Bryant has demonstrated prosecutorial misconduct and fundamental error on this basis.

Bryant appears to argue that the prosecutor misrepresented the evidence when she stated that she did not remember any of the defense witnesses saying that E.B. told them she lied. Bryant contends that the prosecutor argued that E.B. lied to other members of the Aryan Brotherhood but that the record contains no evidence that E.B. spoke to or had any direct contact with any member of the Aryan Brotherhood from December 4, 2010, through the date of the trial. Bryant points to the prosecutor's following statement:

> [T]he defense argument is that [Bryant] couldn't have hit [E.B.] because he's a one-hitter. If he had hit her, she would have been killed. Well, his mother, everyone knows [Bryant's] a one-hitter. . . N[o] one's denying that [Bryant] punched [E.B.]. They're saying if he had, she'd be dead. That was the (inaudible).

Transcript at 816. Bryant points out that no witness testified to the effect that Bryant would have killed E.B. if he had punched her.[5] Also, among other statements, Bryant challenges the prosecutor's use of the word predator to describe him and the description of E.B. as prey. We cannot say that these comments amounted to fundamental error.

Bryant also points to the following statements by the prosecutor:

> The fact that [Bryant] is a member of the Aryan Brotherhood and the fact that he's a vice president is not relevant. You know, it doesn't really matter whether it's (inaudible) or not. But what is relevant is how you get in and how you get out of the Aryan Brotherhood. And [Bryant] told you you get

---

[5] The State points out that Bryant's mother testified that she made the following comment on Facebook: "Everyone knows [Bryant] as a one-hitter. You lying and said he hit you thirteen times. B----, you'd been dead and I wish you were." Transcript at 581.

in by killing or beating someone up severely. The only way you get out is by getting killed or severely injured. And that is relevant because [Bryant] possessed [E.B.], she was his Aryan angel. And the only way [E.B.] was going to get out of their relationship was to be killed or beaten severely. And that was the intent when he broke into her home on December ninth.

Id. at 815-816. Bryant argues that the record contains no evidence that E.B. was a member of the Aryan Brotherhood or that E.B. had to follow the same exit strategy with regard to her relationship with Bryant as members of the Aryan Brotherhood had to follow to leave that organization. The prosecutor stated that "the only way [E.B.] was going to *get out of their relationship* was to be killed or beaten severely," and while the record indicates that Bryant called E.B. his Aryan angel, we cannot say that the prosecutor stated that E.B. was a member of the Aryan Brotherhood. Id. at 427.

Bryant also points to the following exchange which occurred during the prosecutor's closing argument:

[Prosecutor]: . . . . This Defendant is a coward. He beats up women . . . .

THE COURT: [Prosecutor], your audience is the jury.

[Prosecutor]: One third his size. [E.B.] is strong. She is so strong to have survived this. And she may be (inaudible) but inside she's strong. (Inaudible) have moments of strength. In the beginning and in the end. And in the middle, [E.B.] found her inner weakness, but does it (inaudible) or was it because [Bryant] violated the no-contact order and called her three hundred and fifty times and sent her over forty letters. Who could withstand that kind of pressure? Evaluate the evidence. Who do you believe? And when you evaluate and when you determine who to believe, I am confident that you will in fact return a verdict of guilty to each and every crime. Thank you.

31

THE COURT:    If counsel would approach and Officer Whipker, if you'll come up here, please.

**SIDEBAR:**

THE COURT:    Okay, don't ever do that again.  Are you kidding me?  I mean, we've got a security issue here and you're trying to antagonize him.  If you ever do that again, you're going to be in such serious trouble.

Id. at 818-819.  Bryant argues that the prosecutor "crossed the line of propriety by essentially taunting" him and argues that the record contains no evidence or even allegation outside the prosecutor's closing arguments that Bryant ever beat up any other woman.  Appellant's Brief at 43.  The State "acknowledges that this statement was borderline and possibly even crossed the line," but argues that "[n]onetheless, if so, it represented the only *bona fide* instance of prosecutorial misconduct and was fleeting."  Appellee's Brief at 33.  Even assuming that the prosecutor's comments were improper, we cannot say that such conduct resulted in fundamental error.  The jury was instructed as follows: "When the evidence is completed, the attorneys may make final arguments.  These final arguments are not evidence.  The attorneys are permitted to characterize the evidence, discuss the law and attempt to persuade you to a particular verdict.  You may accept or reject those arguments as you see fit."  Appellant's Appendix at 217.  The jury was also instructed as follows: "You are the exclusive judges of the evidence, which may be either witness testimony or exhibits."  Id. at 234.  Lastly, the jury was instructed: "Statements made by the attorneys are not evidence."  Id. at 235.  Under the circumstances, we cannot say that the prosecutor's comments resulted in fundamental error.

V.

The next issue is whether the court abused its discretion in sentencing Bryant. Bryant argues that the trial court abused its discretion and violated Ind. Code § 35-50-1-2 when it imposed consecutive sentences as to most of the offenses for which Bryant was convicted.

Ind. Code § 35-50-1-2(c) provides:

[E]xcept for crimes of violence, the total of the consecutive terms of imprisonment, exclusive of terms of imprisonment under IC 35-50-2-8 and IC 35-50-2-10, to which the defendant is sentenced for felony convictions arising out of an episode of criminal conduct shall not exceed the advisory sentence for a felony which is one (1) class of felony higher than the most serious of the felonies for which the person has been convicted.

Bryant argues that the only crime of violence among his convictions is the burglary conviction. Bryant argues that the five remaining convictions constituted a single episode of criminal conduct. Bryant contends that "[w]hile the offenses occurred several days apart, they involved the same alleged perpetrator, the same victim, the same location, and largely the same alleged criminal acts." Appellant's Brief at 48. The State argues that Bryant was sentenced for two episodes of criminal conduct, one on December 4, 2010, and another on December 9, 2010.

An "episode of criminal conduct" "means offenses or a connected series of offenses that are closely related in time, place, and circumstance." Ind. Code § 35-50-1-2(b). "In making this determination, emphasis has been placed on the timing of the offenses and the simultaneous and contemporaneous nature, if any, of the crimes." Gootee v. State, 942 N.E.2d 111, 114 (Ind. Ct. App. 2011) (citing Reed v. State, 856 N.E.2d 1189, 1200 (Ind. 2006)), trans. denied. "Additional guidance on whether multiple

33

offenses constitute an episode of criminal conduct can be obtained by considering whether the conduct is so closely related in time, place, and circumstance that a complete account of one charge cannot be related without referring to details of the other charge." Id.

Bryant's crime of burglary as a class A felony is a crime of violence and would be exempted from the limitations in Ind. Code § 35-50-1-2(c). Of the five remaining convictions, Counts III and VI related to Bryant's actions which occurred on December 4, 2010, while Counts II, IV, and V related to December 9, 2010. The offenses occurring on December 4th and the offenses occurring on December 9th were separate incidents and the offenses occurring on the separate days can be recounted without referring to the other date. Based upon the record, we cannot say that all of the offenses constituted an episode of criminal conduct. See Beer v. State, 885 N.E.2d 33, 50-51 (Ind. Ct. App. 2008) (holding that Counts I, II, and III were not within the same criminal episode as Counts IV, V, and VI because the controlled buys resulting in Counts I, II, and III occurred days before the search and involved different circumstances).

With respect to Counts II, IV, and V, which related to December 9, 2010, even assuming that all of the offenses which occurred on that date constituted an episode of criminal conduct, the advisory sentence for a felony which is one class of felony higher than the most serious of these felonies would be thirty years which is the advisory sentence for a class A felony. The court ordered that Bryant serve eighteen years for Count II and six years each for Count IV and Count V, and ordered the sentences to be served consecutive to each other for an aggregate sentence on these offenses of thirty

34

years, which is not greater than the advisory sentence for a class A felony and is not in violation of Ind. Code § 35-50-1-2(c).

With respect to the convictions related to December 4, 2010, again even assuming that the offenses that occurred on December 4, 2010, constituted an episode of criminal conduct, the advisory sentence for a felony which is one class of felony higher than the most serious of the felonies occurring on December 4, 2010, would be thirty years which is the advisory sentence for a class A felony. The court sentenced Bryant to eighteen years for Count III, criminal confinement as a class B felony, and six years for Count VI, intimidation as a class C felony, and ordered the sentences to be served consecutive to each other for an aggregate sentence of twenty-four years, which is not greater than the advisory sentence for a class A felony or in violation of Ind. Code § 35-50-1-2(c). Accordingly, we cannot say that the trial court abused its discretion.

## VI.

The next issue is whether Bryant's sentence is inappropriate in light of the nature of the offense and the character of the offender. Ind. Appellate Rule 7(B) provides that we "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, [we find] that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Under this rule, the burden is on the defendant to persuade the appellate court that his or her sentence is inappropriate. Childress v. State, 848 N.E.2d 1073, 1080 (Ind. 2006).

Our review of the nature of the offense reveals that Bryant committed criminal confinement and intimidation on December 4, 2010, and burglary, criminal confinement,

35

battery, and intimidation on December 9, 2010, consistent with the foregoing facts. Our review of the character of the offender reveals that Bryant was adjudicated delinquent for the following offenses if committed by an adult: disorderly conduct and battery. The presentence investigation report ("PSI") indicates that Bryant was charged as a juvenile with being a runaway and multiple counts of battery. As a juvenile, Bryant failed to successfully complete probation on two occasions. In 1999, Bryant was charged with burglary as class B felony and theft as a class D felony, waived into adult court, and pled guilty to burglary as a class B felony. Bryant also has convictions for battery as a class A misdemeanor in 2000, battery and resisting law enforcement as class A misdemeanors in 2003, invasion of privacy as a class A misdemeanor and criminal recklessness as a class D felony in 2007, invasion of privacy as a class D felony in 2009, and possession of methamphetamine as a class D felony in 2010. At the time of the PSI, Bryant had pending charges for intimidation and criminal recklessness as class C felonies and attempted murder as a class A felony. Bryant also had a pending charge for aggravated battery for allegedly stabbing another inmate in the ear while he was incarcerated in the Bartholomew County Jail in June 2011. Since 2000, Bryant has had multiple protective orders issued against him involving six individuals. Bryant has violated conditions of probation numerous times and committed the current offenses while on probation for a previous felony conviction.

Bryant had been a member of the Aryan Brotherhood. Bryant has two children but reported that his visitation rights have been terminated. According to the PSI, Bryant had extensive counseling as a juvenile and was diagnosed with "Conduct Disorder with

36

'narcissistic and antisocial character traits.'" Appellant's Appendix at 291. Bryant has "a long history of substance abuse and treatment." Id. Bryant completed the "IOP program at Quinco/Centerstone in 2003 and 2010" and was referred to a residential treatment program at Liberty Hall, but was terminated from that program as a result of assaulting another client. Id.

After due consideration, we conclude that Bryant's aggregate sentence of ninety-three years is not inappropriate.

For the foregoing reasons, we reduce Bryant's conviction for Count V, battery as a class C felony, to a class B misdemeanor and remand for resentencing on the class B misdemeanor, which will have no effect on the aggregate sentence, affirm Bryant's remaining convictions, and affirm his aggregate sentence.

Affirmed and remanded.

BAKER, J., and KIRSCH, J., concur.